WOODLIFF v. CITIZENS BUILDING & REALTY CO.

1. LANDLORD AND TENANT—CANCELLATION OF LEASE AND SALE TO
LESSEE ON CONTRACT UNDER OPTION NOT FRAUDULENT WHERE
BENEFICIAL—ASSIGNMENTS.

Where the lessee of an apartment building exercised his
right under an option in the lease and purchased the
premises on contract, and said contract was beneficial
to him and to those associated financially with him, they
may not complain that there was fraud in the cancella-
tion of the lease and execution of the land contract; the
landlord not being required to recognize their rights in
the lease because he had not consented to an assign-
ment to them.[1]

2. FRAUDULENT CONVEYANCES—CANCELLATION OF LEASE AND SALE
TO LESSEE ON CONTRACT UNDER OPTION NOT IN FRAUD OF CREDI-
TORS WHERE BENEFICIAL TO THEM.

Where the creditors of the lessee of an apartment build-
ing and those associated financially with him in con-
ducting it were in better condition after the cancellation
of the lease and sale of the premises to the lessee on
land contract, as provided for in the lease, than they
were before, it cannot be said that said transaction was
in fraud of creditors.[2]

3. VENDOR AND PURCHASER—FORECLOSURE—FRAUD—AGREEMENT OF
VENDORS TO SELL AFTER FORECLOSURE SUBJECT TO RIGHTS OF
EXISTING VENDEES NOT FRAUDULENT.

Where the vendees in a land contract were in default to
a large amount and the vendors were entitled to fore-
close, a contract by which vendors agreed to enter into a
contract to sell the premises to a third party, if fore-
closure proceedings were successful and there was no
redemption therefrom, subject to the rights of existing
vendees, entered into while foreclosure proceedings were
pending, was not void as in fraud of the rights of exist-
ing vendees or their creditors.[3]

[1]Landlord and Tenant, 35 C. J. § 105; [2]Fraudulent Conveyances,
27 C. J. § 109 (Anno); [3]Vendor and Purchaser, 39 Cyc. p. 1663.

Appeals from Wayne; Lamb (Fred S.), J., presiding. Submitted October 23, 1925. (Docket Nos. 110, 111.) Decided December 22, 1925. Rehearing denied April 6, 1926.

Bill by Richard S. Woodliff against the Citizens Building & Realty Company, Kenneth M. deVos, and others to set aside assignments of a land contract. The McDonald Coal & Brick Company, a creditor, was permitted to intervene as a party plaintiff. The Detroit Trust Company was appointed receiver by interlocutory decree.

Bill by the Detroit Trust Company, receiver, against Kenneth M. deVos and others to enjoin the forfeiture and foreclosure of a land contract. From a decree for plaintiffs, defendants deVos appeal. Reversed.

*D. W. Closser* and *R. S. Woodliff,* for plaintiff Woodliff.

*Elroy O. Jones,* for plaintiff McDonald Coal & Brick Company.

*E. R. Milburn* and *Prewitt Semmes,* for defendants deVos.

McDONALD, C. J. The matters here involved are presented in two chancery suits which have been consolidated and will be disposed of together. The defendants Kenneth M. deVos and Mary Alice deVos are the owners in fee of the Astor Court apartments located on west Grand boulevard, in the city of Detroit, Michigan. The premises are incumbered by two trust mortgages given to secure an issue of bonds aggregating the sum of $525,000. These bonds mature in monthly installments of $4,500, and, with the interest thereon, require a monthly payment of $6,600.

On the 17th of March, 1921, Kenneth M. deVos and

233—Mich.—19.

Mary Alice deVos, his wife, leased the apartments with their furnishings to one Ralph W. McKinney for the term of 10 years with the exclusive option to purchase within 3 years from date for the sum of $901,000. It was provided in the lease that no assignment thereof should be made without the written consent of the lessors.    With their consent McKinney sold and assigned the lease to Lester H. Cheeseman, who went into possession of the apartments in May, 1922.    He remained in sole possession until November 23, 1922, at which time he entered into an agreement with Richard S. Woodliff, Louis A. Nall and Justice R. Pierson, for the sale of his interest.    The lease was not assigned to them by Cheeseman because the agreement of sale was never fully performed.    But they made payments to him and deeded some property, a part of which is herein referred to as the Towar farm, located in Oakland county.    Subsequently, it was agreed that Cheeseman should retain an interest and that the business should be conducted as a joint undertaking.    This agreement was not reduced to writing, but there is no dispute between the parties as to their respective interests.    The lessors refused to consent to an assignment of the lease and it remained in Cheeseman's name.    On the 1st day of May, 1923, Cheeseman exercised his option under the lease to purchase the apartments, but the conditions of the sale were not complied with by him until the 27th of July, 1923, at which time the purchase contract was delivered and the lease surrendered.    As a part of the initial payment, Cheeseman deeded to deVos the Towar farm and received back a contract to repurchase it for $25,000.    This amount was credited to him on the Astor Court apartments contract.    On the 1st day of August, 1923, Cheeseman sold and assigned these contracts to the Citizens Building & Realty Company.    This company, being unable to

make their payments, was compelled to borrow $10,000 from Arthur Ledbetter.   To secure the payment of the loan and a bonus charge of $5,000, the realty company gave an assignment of the Cheeseman contracts. Ledbetter gave back an agreement to re-assign on payment of the loan.   This loan was made from the Ford State Bank through the agency of John N. Anhut and Byron J. Oades, both of whom were officers of that bank.   Ledbetter then assigned his interest to one Henry B. White, and White assigned to the Irving Apartment Hotel Corporation, in which White and Anhut owned all of the stock.   This corporation subsequently sold and assigned its interest in the contract to Oades.

The McDonald Coal & Brick Company furnished coal for the apartments and was a creditor, first of Cheeseman, then of Cheeseman, Woodliff, Pierson and Nall. When the assignment of the contract was made to the Citizens Building & Realty Company, it assumed the obligation to pay the account of the McDonald Coal & Brick Company.   It was not paid, and when the first one of these two suits was started the McDonald Coal & Brick Company was permitted to intervene as a party plaintiff.

The first suit was begun by Woodliff.   In his bill, after reciting his interest in the contract, he asked that the assignment to the Citizens Building & Realty Company, and all subsequent assignments, be set aside on the ground of fraud; that he be given a lien on the deVos-Cheeseman contract for his interest; that the Citizens Building & Realty Company and the other defendants be required to pay the indebtedness assumed by the realty company; that all of the defendants be enjoined from making any further assignments or selling or mortgaging the property, and that a receiver be appointed to take possession of the apartments, collect the income and pay all outstanding

indebtedness.    Kenneth M. deVos and Mary Alice deVos were not made parties to this suit.    Defendants Ross, Honeywell, Oades and Moesta were made parties on the claim that, as active directors of the Citizens Building & Realty Company, they were individually liable for its acts.    On the hearing the court made an interlocutory decree in which he set aside the assignment to the Citizens Building & Realty Company and all subsequent transfers, and declared the vendees' interest in the deVos-Cheeseman contract to be in Cheeseman, subject to the conditions existing at the time of its assignments, and to the expenditures made in good faith by all subsequent assignees, all of which was to be determined by a special commissioner appointed for that purpose.    The Detroit Trust Company was appointed receiver.

The interlocutory decree was filed July 28, 1924. On the 5th of August, 1924, the Detroit Trust Company, receiver, began suit against deVos and wife to restrain them from declaring a forfeiture of the Cheeseman contract, and from prosecuting any proceedings for foreclosure other than in chancery.    The defendants answered with a cross-bill in which by way of affirmative relief they asked for the foreclosure of the land contract.    On the 20th of December, 1924, the plaintiff in the first suit, Richard S. Woodliff, filed an amended bill making Kenneth M. deVos and wife parties defendant.    When the receiver's suit came on to be heard the two suits were consolidated and the court made a decree in which he incorporated many of the provisions of the interlocutory decree, dismissed the cross-bill of defendants Kenneth M. deVos and Mary Alice deVos, enjoined them from foreclosing the land contracts, declared the surrender of the lease to be void as to Woodliff, Pierson, Nall and their creditors, and directed that the receiver sell at public or private sale the interests of all of the parties to

the two suits.    From this decree only defendants deVos and wife have appealed.    Subsequently, a supplementary decree was entered in which the receiver was authorized to offer the Astor Court apartments at private sale for the best price obtainable, and to report to the court for approval.    This decree also declared the rights of Kenneth M. deVos and Mary Alice deVos in the lease to be inferior and subordinate to the claims of creditors accruing prior to the date of surrender of the McKinney lease by Cheeseman.

The record presents the following questions:

1. Was the surrender of the McKinney lease and the giving of a purchase contract to Cheeseman void as to Woodliff, Pierson and Nall and their creditors?

It will be remembered that when the McKinney lease was surrendered it was in Cheeseman's name.    When Woodliff, Pierson and Nall arranged with Cheeseman to buy his interest, deVos refused to consent to an assignment to them.    They then made a different arrangement with Cheeseman by which they were to have a joint interest with him and were to manage the apartments in his name, but as a joint undertaking.    Cheeseman wanted to exercise his option under the lease to purchase the premises.    He began negotiations with deVos.    That he was doing so was known to Woodliff, Pierson and Nall.    In fact, Woodliff got the lease and gave it to Cheeseman that it might be surrendered to deVos.    Mr. Cheeseman testified that, when he was negotiating with deVos for the purchase contract, he discussed it with Woodliff, Pierson and Nall, and that they were quite pleased because their payments under the contract would be less than under the lease.    As a matter of fact, Cheeseman was greatly benefited by exchanging the lease for the land contract, and Woodliff, Pierson and Nall shared in the benefits, for they were jointly interested with Cheeseman.    By the terms of the contract the

price of the property was reduced to the extent of $199,000 less than was agreed upon in the lease; the down payment was reduced by approximately $30,000 and the monthly payments by $800. It is difficult to see in what way these men were injured by the surrender of the lease and the making of the purchase contract. As between them and Cheeseman they had their equitable interest in a land contract which Cheeseman never failed to recognize and which was of more value to them than their interest in the lease. Moreover, deVos was under no obligation to consult them or to consider their interests in making the contract with Cheeseman. He had no contract with them, and was not obliged to inquire as to their arrangement with Cheeseman. It was his right and duty under the lease to make the contract of purchase with Cheeseman and unless in doing so with a full knowledge of the other parties' interests, he did something that amounted to a fraud upon their rights, he would not be responsible. There is nothing in the record tending to show that either Cheeseman or deVos acted in bad faith. It is clear that Woodliff, Pierson and Nall were well satisfied with the contract and the surrender of the lease, but that later, in conjunction with Cheeseman, they made an unfortunate deal with the Citizens Building & Realty Company, and are here attempting to make deVos share the responsibility therefor, though he had nothing to do with that transaction. We think that the court was wrong in finding that the surrender of the lease and the making of the contract of purchase was void as to Woodliff, Pierson and Nall. There is no evidence to support such a finding.

As to the creditors of Cheeseman, Woodliff, Pierson and Nall, the court found that the exchange of the lease for the purchase contract tended to hinder, delay and defraud them and was therefore void as to

them. It would seem that the creditors were in a better position to secure their claims after the contract than they were before. With the lease available they would be compelled to file a creditors' bill to reach their debtors' interests. In place of the lease they had a land contract on which they could levy and in which their debtors had a more valuable interest than they had in the lease. They lost nothing by the transaction. Cheeseman's property was not placed beyond their reach. It was enhanced in value and was just as available to the creditors as it was before. What we have here said applies also to the transfer of the Towar farm to deVos. The consideration for the farm went into the contract and increased Cheeseman's equity to that extent. In addition it may be said that there is a total lack of evidence tending to show that Cheeseman intended to defraud his creditors or that he and deVos acted in collusion with that purpose. We think that the court was wrong in finding that the transactions above referred to tended to hinder or defraud the creditors of Cheeseman or of Woodliff, Pierson and Nall. The lease provided for a rebate to the lessee of $40,000 during the last six months of the term which was for 10 years. This $40,000 would not be available to Cheeseman or his creditors unless the provisions of the lease were fully complied with for the full term. The lease provided for an option to purchase during the period of 3 years from date. When the option was exercised the rebate was not owing to the lessee. Notwithstanding this fact, deVos allowed it and credited it as an initial payment on the land contract. This was of benefit to Cheeseman and his creditors because it made the $40,000 immediately available to them. The creditors lost nothing by the exchange of the lease for the land contract. On the contrary they were placed in a more favorable position to realize on their claims. We see no fault in either Cheeseman

or deVos in the transactions complained of. Cheeseman made a good deal when he exchanged the lease for the contract, and whatever benefit he received was shared by Woodliff, Pierson and Nall and the creditors. The court was wrong in finding that the transaction tended to hinder, delay and defraud creditors, and that the surrender of the lease was void as to them.

2. The second question presented by the record relates to the deVos-Oades contract. On the 10th of July, 1924, there was due and unpaid on the land contract the sum of $6,400. De Vos began proceedings in the circuit court commissioner's court for possession of the property. On the 18th of July, 1924, he made a contract with Oades wherein it was agreed that if he succeeded in foreclosing the land contracts and if there was no redemption from such foreclosure, he would enter into a land contract to sell the Astor Court apartments and the Towar farm to Oades, subject to any and all rights of those claiming any interest by reason of the Cheeseman contract. It is not necessary to refer further to the provisions of this contract. The court held that it was in fraud of the rights of the Citizens Building & Realty Company and their creditors and set it aside. Nothing was claimed for or against this contract in any of the pleadings. The creditors cannot be interested in it or affected by it because it provides for a sale to Oades only after foreclosure from which there has been no redemption. The entire interest then would be in deVos, and he could make any kind of a contract that he pleased in reference to it. The creditors have no rights except in the vendees' equity in the land contract, and deVos was not attempting to sell that contract or any interest in it to Oades. If, however, the creditors had any interests which would not be precluded by a foreclosure, these interests were preserved by the contract which expressly provided that

the sale to Oades should be subject thereto.    Of course, this contract with Oades might interfere with the interests of creditors if they had been in a position to delay a foreclosure or assail a declaration of forfeiture.    But the right of deVos to declare a forfeiture or to declare the whole amount due because of the default in the payments is not questioned except on the theory that the contracts were void.    No one was ready or willing to make the payments on the land contracts.    In June the court had declared that all assignments of the contracts were void and placed the title thereto back in Cheeseman, and Cheeseman had refused to make payment of the amount due. So that there was a default in the payments and deVos had a right to take proceedings for foreclosure. And this default did not arise because of any collusive agreement with Oades.    The deVos-Oades agreement does not seem to have injuriously affected the interest of any one.    The record discloses no reason for setting it aside.

It is not necessary to discuss the case further.    As to the defendants Kenneth M. deVos and Mary Alice deVos the decree of the circuit court is clearly wrong and should be reversed.    It is undisputed that there is a large amount due and unpaid on both contracts. They are entitled to foreclose.    The decree of this court will provide for the payment to Kenneth M. deVos and Mary Alice deVos, within 30 days from the date thereof, the amount then due on both contracts; and in default of such payment they will be permitted to prosecute the pending foreclosure proceedings.    Costs of both courts will be taxed against Richard S. Woodliff and the McDonald Coal & Brick Company.

CLARK, BIRD, SHARPE, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.